PUBLISH

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

FILED
U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
JULY 10, 2001
THOMAS K. KAHN
CLERK

_____

No. 99-13198
_____

D. C. Docket No. CV 93-N-1121

ANTHONY KEITH JOHNSON,

Petitioner-Appellant,

versus

STATE OF ALABAMA,
JOHN E. NAGLE,

Respondents-Appellees.

_____

Appeal from the United States District Court
for the Northern District of Alabama

_____

**(July 10, 2001)**

Before TJOFLAT, BLACK and MARCUS, Circuit Judges.

MARCUS, Circuit Judge:

In this appeal, we consider the request for a writ of habeas corpus by

Petitioner Anthony Keith Johnson, a state prisoner in Alabama. Johnson was

indicted and convicted of capital murder in the 1984 shooting death of Kenneth

Cantrell in Morgan County, Alabama. The state trial court imposed a sentence of

death. That judgment was later upheld on direct appeal and again on collateral

attack by the Alabama Court of Criminal Appeals. In this federal habeas petition,

Johnson argues that his conviction should be set aside on a variety of grounds. He

contends, among other things, that his trial attorneys rendered him constitutionally

ineffective assistance by choosing a flawed defense strategy. The district court

conducted a hearing on Johnson's petition and subsequently issued a lengthy and

well-reasoned order denying all relief. Johnson has now sought review from this

Court. Having carefully reviewed the record and considered the parties'

arguments, we affirm.

I.

A.

The facts presented at trial are set forth at length in the district court's order

as well as the opinion on direct review of the Alabama Court of Criminal Appeals.

See Johnson v. Nagle, 58 F. Supp. 2d 1303, 1314-15 (N.D. Ala. 1999); Johnson v.

State, 521 So. 2d 1006, 1007-08 (Ala. Crim. App. 1986), aff'd, 521 So. 2d 1018

(Ala. 1988), cert. denied, 488 U.S. 876, 109 S. Ct. 193 (1988). On the evening of

March 11, 1984, the victim, Kenneth Cantrell, and his wife were at their home in

Hartselle, Alabama. The Cantrells had been in the jewelry business for 24 years and at this time were conducting the business from their home. Mrs. Cantrell received a phone call from a person who identified himself as Bill Spears from Florence, Alabama, and asked to speak to Mr. Cantrell. He told Mr. Cantrell that he would like to purchase some jewelry from him, and they arranged a meeting a short time thereafter at the Cantrell home. Mr. Cantrell was apparently suspicious of the caller, because he asked his wife to hide his wallet and bring him his .38 caliber pistol. When Mrs. Cantrell heard a knock at the door, which led from their carport into the combined living room and dining room area of their home, she went to answer it. She observed that the man already had the storm door open, but she had to open the door to hear what he had to say.

When she opened the door she encountered a man between 45 and 50 years of age who identified himself as Bill Spears. She noticed that he held one hand behind his back, and she asked if he was concealing something. He said that he was not and showed her his hand. At the same time he motioned for another man who had been hiding in the carport to come forward. The man already at the door then grabbed Mrs. Cantrell, and the other man, wearing a blue bandana over his face and brandishing a "real shiny" gun in his hand, announced "This is a holdup."

3

At that point, Mrs. Cantrell broke free from the man holding her, eluded a second attempt by the first man to grab her, and fell at her husband's feet between the couch and coffee table. The first man crossed the room and positioned himself behind a couch he had overturned. The second man then entered the house and began shooting. During or just before the gunfight, Mr. Cantrell allegedly said, "Freeze . . . I have got you covered," to which one of the men replied "No, we have got you, Cantrell." While on the floor, Mrs. Cantrell was able to observe that one of the men wore a pair of brown boots. She also testified that only two guns were fired during the exchange, and that the shots fired at her husband appeared to come from the direction of the second intruder. After several shots had been fired, there was a pause in the gunfire. One of the men said: "Come on in, Bubba . . . we have got him." As the two men in the room made their way to the door, but before they reached it, Mr. Cantrell fired one final shot and someone said "Oh." Mrs. Cantrell then heard the sound of shuffling feet, as if one of the intruders was being assisted out of the house.

After the intruders left, Mrs. Cantrell waited a moment, looked up at her husband, noticed that he had blood all over him, and that she had blood all over her but had not been shot. She then called an ambulance and police to the scene. Mr. Cantrell sustained six gunshot wounds in the exchange, three in the right side of his

4

chest, one in the left side of his chest, one in the back of his right arm, and one to his right middle finger. The bullets that struck him in the chest passed through his lungs and the large arteries from the heart, causing rapid death.

On the evening of March 12, 1984, the day after the murder, Johnson went to the home of David Lindsey, who was a friend, in Newell, Alabama. Johnson told Lindsey that he had been shot. When Lindsey inquired as to what had happened, Johnson stated, "Well you know how it is when you have got the habit." Johnson told Lindsey that he knew Lindsey had been to Vietnam, and asked if Lindsey knew a medic or someone who could get the bullet out. Lindsey told him that he knew no one who could do that.

At Johnson's request, Lindsey, on the morning of March 13, 1984, drove Johnson to a motel in Oxford, Alabama, to meet Gene Loyd. Loyd and Johnson were glad to see each other, and Loyd asked Johnson where he had been. Johnson replied that he "had to get the hell out of Hartselle." He said that he and some friends had gone into a place to "get some gold" and that he had been shot. According to Lindsey, Johnson stated: "I got shot, but I got off a couple of rounds, and I believe I got that son of a bitch." Lindsey returned home, where he heard that a murder had occurred in Hartselle, and he contacted law enforcement.

Johnson was arrested on March 14, 1984, at the motel where he had been taken by Lindsey. A pair of brown boots, which Johnson claimed to own, were found at the scene of the arrest. A bullet wound was discovered in his back; that wound was 50.5 inches from the ground when Johnson was standing.

A search warrant was eventually obtained, and the bullet was surgically removed from Johnson's back.[1] The bullet that was removed from Appellant's back was a .38 special C.C.I. Blazer, the same kind of bullet fired by Mr. Cantrell's revolver. The bullet had the same characteristics as those test-fired from Mr. Cantrell's R.G. revolver and those found at the scene, although it was impossible to make a definite determination that Mr. Cantrell's revolver actually fired the bullet. The bullet that was removed from Johnson's back also had glass embedded in its nose. Test comparisons of the glass removed from the bullet and the glass found in the pane on the back door (through which the unaccounted-for bullet had passed) revealed that all of their physical properties matched, with no measurable

_____

[1]Johnson challenged the trial court's authorization of that procedure at the time and thereafter (including in the district court in this habeas proceeding), but does not raise the issue on appeal to this Court. In any event, we find no error entitling Johnson to relief.

6

discrepancies.  Based upon F.B.I. statistical information, it was determined that only 3.8 out of 100 samples could have the same physical properties.[2]

B.

After the petitioner was arrested as a murder suspect, two attorneys (Propst and DiGiulian) were appointed to represent him.  On March 26, 1984, Johnson was formally charged with capital murder.  In June 1984, a Morgan County grand jury indicted Johnson for the intentional murder of Kenneth Cantrell during the course of a robbery, in violation of Ala. Code § 13A-5-40.  A year later, on June 20, 1985, Johnson was found guilty by a jury of capital murder as charged in the indictment.

On June 21, 1985, the jury voted nine to three to recommend that Johnson be sentenced to life imprisonment without the possibility of parole instead of death.  On November 8, 1985, the trial court -- having conducted the sentencing hearing required by Ala. Code § 13A-5-47 -- rejected the recommendation of the jury and sentenced Johnson to death.  The court found two of the statutory aggravating

---

[2]It was discovered that Mr. Cantrell had fired his R.G. brand revolver six times at the intruders.  Most of the shots were in an upward direction from the point where he was sitting on his couch.  The revolver was loaded with .38 special C.C.I. Blazer cartridges manufactured by Omark Industries.  Four C.C.I. Blazer bullets were recovered from objects which they had struck at the scene.  One bullet apparently passed through the ceiling and could not be found.  One bullet passed through a pane of glass on the back door 46.375 inches from the ground.  A search of cardboard boxes and the wall in this bullet's path failed to reveal the bullet.  The four C.C.I. Blazer bullets found at the scene had the same number of lands and grooves as the bullets test fired from Mr. Cantrell's R.G. revolver, but again, it was impossible to determine definitively that Mr. Cantrell's revolver actually fired the bullets.

7

circumstances defined at Ala. Code § 13A-5-49: (1) the capital offense was committed by a person under sentence of imprisonment, and (2) the capital offense was committed while the defendant was engaged in the commission of a robbery. The court acknowledged that there was some potentially mitigating evidence, but ultimately ruled that the aggravating circumstances were substantial and controlling.[3]

Johnson appealed to the Alabama Court of Criminal Appeals, where he was represented by newly-appointed appellate counsel (Mays). On November 25, 1986, the Alabama Court of Criminal Appeals issued a written opinion affirming the conviction and sentence. The Alabama Supreme Court affirmed the conviction and sentence on February 5, 1988, and the United States Supreme Court denied Johnson's petition for the writ of certiorari on October 3, 1988.

After the direct review process was completed, Johnson's present counsel then undertook to represent him in post-conviction proceedings. They started by seeking relief in the Alabama courts, filing on April 4, 1989, a petition under Rule 20 of the Alabama Rules of Criminal Procedure. The petition, as amended, raised a large number of claims. The Circuit Court of Morgan County twice denied the

---

[3]Johnson does not challenge the sentencing process in this petition; his objections go instead to the underlying conviction for capital murder.

8

petition, only to have the Court of Criminal Appeals twice remand for the entry of express findings after a hearing. On June 17, 1991, the trial court submitted a more specific order denying the Rule 20 petition.

Johnson then appealed the denial of his petition to the Alabama Court of Criminal Appeals, which made written findings of its own and affirmed in a written opinion dated on September 18, 1992. See Johnson v. State, 612 So.2d 1288 (Ala. Crim. App. 1992). The Alabama Supreme Court denied Johnson's petition for the writ of certiorari on February 19, 1993, and there is no indication that Johnson sought further review from the U.S. Supreme Court.

## C.

On June 7, 1993, Johnson filed this petition for habeas corpus pursuant to § 2254, asserting seven principal grounds for relief (only some of which are pursued now on appeal). In response, the State filed memoranda and introduced numerous documents and records from the various state court proceedings. The district court eventually conducted an in camera evidentiary hearing regarding communications between Johnson and his trial attorneys concerning Johnson's participation in the

events surrounding the robbery and murder. Johnson's trial attorneys were also directed to file under seal materials that contained these communications.[4]

According to the district court, at the hearing, Johnson's trial lawyers "made it clear that what Johnson had told his [trial] attorneys about his personal participation in the robbery and murder of Mr. Cantrell completely refuted his present attorneys' 'fictionalized' account of his participation, upon which most of their present arguments are founded." 58 F. Supp. 2d at 1326 n.14. The district court found that Johnson had told his trial attorneys that he had participated in the robbery, had personally fired shots at Mr. Cantrell, and had been wounded by

---

[4]After seeking guidance from the parties, the district court initially determined that it could address all of the claims presented in Johnson's petition on the basis of the state court record without holding an evidentiary hearing. Subsequently, the court attempted to hold an evidentiary hearing regarding "what petitioner told counsel about the crime and his role in it in order to assess whether their strategic and tactical choices were reasonable in the light of the information known to them." On February 28, 1996, we stayed the district court's order and directed the court to conduct first an in camera hearing in order "to determine whether and to what extent appellant's communication presumptively protected by the attorney-client privilege is relevant to the specific ineffective assistance of counsel claims raised by appellant in his habeas petition." When Johnson later sought another stay of the district court's order directing counsel to produce their notes, we denied his request, finding that "the district court's decision to order production under seal of trial counsel's notes for purposes of the in camera relevance hearing is reasonable and necessary."

In his brief, Johnson asserts that the district court "abused" our rulings by relying on the contents of these attorney-client communications in assessing the reasonableness of the strategy pursued by trial counsel. We reject that assertion. Implicit in our rulings was the expectation that, if the district court found the communications relevant to accurate resolution of Johnson's ineffectiveness arguments -- and the specific communications relied upon by the district court plainly are -- the privilege would not apply and the district court should consider the communications in analyzing Johnson's claim of ineffectiveness. As discussed below, such an approach is entirely proper in these kinds of cases.

10

Mr. Cantrell. As discussed below, these statements are indeed at odds with the theory of defense advanced now by Johnson's habeas counsel.

On July 23, 1999, the district court entered an exhaustive order considering but ultimately rejecting each of Johnson's many habeas objections. In so doing, the court made various independent findings of fact, and determined as well that findings of the Alabama Court of Criminal Appeals were supported by the record. This appeal followed.

## II.

Johnson filed his § 2254 petition prior to the effective date of the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"). Therefore, this case is governed by pre-AEDPA law. See Lindh v. Murphy, 521 U.S. 320, 336-37, 117 S. Ct. 2059, 2068 (1997). Under pre-AEDPA law, we review the denial of Johnson's § 2254 petition, and the district court's subsidiary legal conclusions, de novo. See, e.g., Yeck v. Goodwin, 985 F.2d 538, 540 (11th Cir. 1993); Oliver v. Wainwright, 782 F.2d 1521, 1524 (11th Cir. 1986). District court findings of fact are subject to the clearly erroneous standard. See Williams v. Turpin, 87 F.3d 1204, 1209 (11th Cir. 1996). The state court's factual findings are generally entitled to a presumption of correctness and may be ignored only if the petitioner shows by clear and convincing evidence that the state court's

11

determination was not "'fairly supported by the record.'" Griffin v. Wainwright, 760 F.2d 1505, 1511 (11th Cir. 1985) (quoting pre-AEDPA § 2254(d)). This presumption is equally applicable to state appellate court findings of fact. See, e.g., Sumner v. Mata, 449 U.S. 539, 549, 101 S. Ct. 764, 770 (1981).

Johnson asserts multiple grounds for granting his § 2254 petition. His principal arguments are the following: (1) there was insufficient evidence to convict him of capital murder, especially on the issue of his intent to kill; (2) his trial attorneys provided ineffective assistance of counsel (i) by adopting an unreasonable defense strategy that failed to challenge the State's proof of intent; (ii) by failing to request a jury instruction on felony murder; (iii) by making improper remarks during closing argument and also failing to object to improper remarks by the prosecutor; and (iv) by inadequately cross-examining Lindsey and failing to call witnesses who might have impeached Lindsey's testimony; (3) his appellate lawyer provided ineffective assistance of counsel; (4) the State committed a Brady violation by suppressing material that could have been used to impeach witnesses unfavorable to the defense; and (5) the trial court's "reasonable doubt" instruction impermissibly lowered the State's burden of proof below that

required by the Constitution. We address these arguments in turn, and find each of them to be without merit.[5]

## III.

Johnson's first argument for relief is that there was insufficient evidence to prove him guilty of capital murder beyond a reasonable doubt. In particular, Johnson contends that there was insufficient evidence of his specific intent to kill. Before addressing this argument, however, we must consider whether it has been preserved for federal court review. We agree with the district court that this claim has been procedurally defaulted. We also agree that this argument fails on its merits.

## A.

We turn initially to the question of procedural default. To obtain a writ of habeas corpus under § 2254, a petitioner must not have procedurally defaulted his federal claims in the state courts. See, e.g., Wainwright v. Sykes, 433 U.S. 72, 82-85, 97 S. Ct. 2497, 2504-06 (1977). "Federal review of a petitioner's claim is barred by the procedural default doctrine if the last state court to review the claim states clearly and expressly that its judgment rests on a procedural bar, and that bar

---

[5]Arguments by Johnson not specifically addressed in this opinion are likewise without merit.

13

provides an adequate and independent state ground for denying relief." Johnson v.

Singletary, 938 F.2d 1166, 1173 (11th Cir. 1991) (en banc) (citing Harris v. Reed,

489 U.S. 255, 263, 109 S. Ct. 1038, 1043 (1989)).

The Alabama Court of Criminal Appeals, considering Johnson's appeal from

the denial of his state post-conviction petition, expressly found that Johnson's

sufficiency of the evidence challenge was procedurally barred as a matter of

Alabama law to the extent it "could have been but was not raised on [direct]

appeal." Johnson v. State, 612 So. 2d at 1292. The district court found that the

particular insufficiency of the evidence claim asserted by Johnson in this

proceeding could have been, but was not, raised on direct appeal, and therefore, by

virtue of the Alabama Court of Criminal Appeals's decision, is procedurally barred

from federal court review. We agree. See Chandler v. Moore, 240 F.3d 907, 912

(11th Cir. 2001); Singletary, 938 F.2d at 1173.

Johnson insists that he did argue insufficiency of the evidence on direct

appeal. But while state appellate counsel attacked the sufficiency of the evidence

regarding Johnson's presence at the scene, there was no appeal on the separate and

distinct issue of whether there was sufficient evidence that Johnson had the specific

intent to kill required under Alabama's capital murder law. Johnson does not

contend that such an argument was advanced (indeed, appellate counsel's failure to

14

advance that argument is one of the reasons Johnson now claims ineffective assistance of counsel), and there is no indication that the Alabama Court of Criminal Appeals, in its ruling on Johnson's state habeas petition, thought that such an argument was among those raised or addressed on direct appeal. See 612 So. 2d at 1292. This is not a situation where, to use Johnson's words, a claim was presented fairly but "inartfully" on direct appeal; rather, the sufficiency of the evidence argument advanced by Johnson on direct appeal was totally different from that advanced in this federal proceeding. Insufficiency of the evidence is simply too broad and malleable an objection to hold, in these circumstances at least, that a direct appeal in state court challenging the sufficiency of the evidence on one theory is enough to preserve for federal habeas review a challenge to the adequacy of proof on a factually and legally distinct theory never fairly presented to the state courts. Cf. Hart v. Estelle, 634 F.2d 987, 989 (5th Cir. 1981) (exhaustion of state remedies requirement not satisfied where the petitioner "technically asserted the same constitutional deficiency and the same facts" in the federal proceeding, but did so "in support of a different legal theory"). We therefore find that this claim has been procedurally defaulted.[6]

_____

[6]Johnson cites a treatise for the proposition that "procedural default 'has not occurred for purposes of federal habeas review' where state law bars a petitioner from presenting a claim in state post-conviction proceedings that has previously been raised on direct appeal." Pet. Br. at 54 n.40. That is not the problem here, however, because -- as we discuss -- Johnson's current

15

If a petitioner has procedurally defaulted a federal habeas claim, he may be nevertheless heard on that claim if he can show "cause" for the procedural default and "prejudice" attributable thereto. See Murray v. Carrier, 477 U.S. 478, 485, 106 S. Ct. 2639, 2644 (1986). To show cause, a petitioner must prove that "some objective factor external to the defense impeded counsel's efforts" to raise the claim previously. Id. at 488, 106 S. Ct. at 2645. Once cause is proved, a petitioner also must prove prejudice. He must show "not merely that the errors at his trial created a possibility of prejudice, but that they worked to his actual and substantial disadvantage, infecting his entire trial with error of constitutional dimensions." United States v. Frady, 456 U.S. 152, 170, 102 S. Ct. 1584, 1596 (1982) (emphasis in original).

sufficiency of the evidence challenge was not raised on direct appeal, and hence it was not among the separate group of sufficiency of the evidence claims that the Alabama Court of Criminal Appeals ruled in the post-conviction proceeding were barred because they had already been raised on direct appeal. See 612 So. 2d at 1292 ("We hold that to the extent this [alleged insufficiency of proof] claim constitutes the same insufficiency-of-evidence issue asserted on direct appeal, this claim is procedurally barred from review under [Rule 20.2(a)(4)] because it was raised or addressed on appeal. We likewise hold that to the extent that this claim differs from the insufficiency of the evidence issue asserted on direct appeal, this claim is procedurally barred from review under [Rule 20.2(a)(5)] because it could have been but was not raised on appeal."). Johnson's other assertion that Alabama fails to adhere to its own default rules -- see Blount v. State, 572 So. 2d 498 (Ala. Crim. App. 1990) and Falkner v. State, 586 So. 2d 39 (Ala. Crim. App. 1991) -- is unpersuasive. The exceptions applied in these decisions are not as broad as Johnson claims, and do not establish that Alabama would not regularly apply its default rules in the situation we have here.

If a petitioner cannot show cause, he may still survive a procedural bar by proving that the failure to hear the merits of his claim would endorse a fundamental miscarriage of justice. See Murray, 477 U.S. at 495, 106 S. Ct. at 2649. This exception is exceedingly narrow in scope, as it concerns a petitioner's "actual" innocence rather than his "legal" innocence. See Calderon v. Thompson, 523 U.S. 538, 559, 118 S. Ct. 1489, 1502-03 (1998); Murray, 477 U.S. at 495-96, 106 S. Ct. at 2649 (explaining that a "fundamental miscarriage of justice" occurs "in an extraordinary case, where a constitutional violation has resulted in the conviction of someone who is actually innocent"). To meet this standard, a petitioner must "show that it is more likely than not that no reasonable juror would have convicted him" of the underlying offense. Schlup v. Delo, 513 U.S. 298, 327, 115 S. Ct. 851, 867 (1995). In addition, "'[t]o be credible,' a claim of actual innocence must be based on reliable evidence not presented at trial." Calderon, 523 U.S. at 559, 118 S. Ct. at 1502-03 (quoting Schlup, 513 U.S. at 324, 115 S. Ct. at 865) (explaining that "[g]iven the rarity of such evidence, in virtually every case, the allegation of actual innocence has been summarily rejected" (internal quotation marks omitted)).

Neither exception to the procedural bar rule applies in this case. Johnson's only "cause and prejudice" argument stems from his appellate counsel's purportedly ineffective assistance in failing to litigate on appeal the intent issue.

17

As discussed below, however, we do not find appellate counsel to have been constitutionally ineffective. Nor, as discussed below, does Johnson show "actual innocence." Johnson bases his objection on a new theory of defense, not newly-discovered evidence. He has not come forward with any new evidence in support of his petition. In any event, we cannot say that it was more likely than not that no reasonable juror would have convicted Johnson of capital murder.

B.

Indeed, on the merits, we agree with the district court that the evidence at trial was sufficient to sustain Johnson's capital murder conviction. The question we ask is very limited: whether, after reviewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the petitioner guilty beyond a reasonable doubt. See Jackson v. Virginia, 443 U.S. 307, 313, 99 S. Ct. 2781, 2785 (1979); Martin v. Alabama, 730 F.2d 721, 724 (11th Cir. 1984). Although each element of the offense must be established beyond a reasonable doubt, see Bishop v. Kelso, 914 F.2d 1468, 1470 (11th Cir. 1990) (citing Jackson, 443 U.S. at 316, 99 S. Ct. at 2787), the State is not required to rule out every hypothesis except that of the guilt of the defendant, see Jackson, 443 U.S. at 326, 99 S. Ct. at 2792-93; Martin, 730 F.2d at 724. When the record reflects facts that support conflicting inferences, there is a presumption that the

18

jury resolved those conflicts in favor of the prosecution and against the defendant. In other words, federal courts must defer to the judgment of the jury in assigning credibility to the witnesses and in weighing the evidence. See Jackson, 443 U.S. at 326, 99 S. Ct. at 2793; Wilcox v. Ford, 813 F.2d 1140, 1146 (11th Cir. 1987).

In this proceeding, Johnson's sufficiency challenge revolves around a so-called "third man" defense. Specifically, Johnson contends that the trial evidence indicates that he was not one of the two robbers who shot at Cantrell, but rather was a "third" man who participated in the robbery but not in Cantrell's shooting death. As this theory goes, Johnson entered the Cantrell house during a lull in the shooting just in time to be caught in the back by the dying Mr. Cantrell's last shot.

This theory -- which was not advanced by Johnson's trial or appellate counsel in state court -- attempts to build upon apparent confusion in the testimony of Mrs. Cantrell, the only surviving eyewitness to the shooting, as well as a nuance in Alabama's capital murder scheme. Although Alabama law does identify robbery as one of the circumstances that may elevate a murder to a capital offense, see Ala. Code § 13A-5-40(a)(2), mere participation in a robbery that leads to a killing is not sufficient for a capital conviction. Alabama's capital murder statute applies only when the defendant has specific intent to kill, and thereby is guilty of an intentional murder. See Ex parte Murray, 455 So. 2d 72, 74 (Ala. 1984); Lewis

19

v. State, 456 So. 2d 413, 416 (Ala. Crim. App. 1984) (stating that "no defendant is guilty of a capital offense unless he had an intent to kill, and that intent to kill cannot be supplied by the felony murder doctrine").

The State has acknowledged that Mr. Cantrell was actually killed by the unidentified "first" man rather than by Johnson. That acknowledgment does not relieve Johnson of liability, however. Johnson may still be liable for capital murder upon proof of complicity in an intentional murder carried out by another. This theory of liability requires more than proof of participation in a robbery; it also requires proof that Johnson, with an intent to kill, aided another in the killing Mr. Cantrell. See Ex parte Raines, 429 So. 2d 1111, 1112-13 (Ala. 1982).[7]

At trial, the state offered evidence indicating that Johnson possessed the intent required under Alabama's capital murder statute. First, the State put Lindsey on the stand to testify that Johnson admitted shooting a robbery victim in Hartselle.

---

[7]Johnson contends that the jury did not convict him under this theory. He contends that the indictment may be read as charging him with capital murder only as a principal (rather than an accomplice) in the killing of Mr. Cantrell. Johnson maintains that upholding his conviction on an accomplice or "complicity" theory would invade the province of the jury, apparently because the jury returned a verdict convicting Johnson of capital murder "as described in the indictment." We disagree with Johnson's reading of the indictment as well as his understanding of the law. There was no requirement that the State specifically allege Johnson's liability for Mr. Cantrell's death as an accomplice rather than as a principal; it was enough that the State alleged his liability for capital murder. Nor is there any requirement that the jury make a specific "finding" that the State proved Johnson guilty as an accomplice as opposed to or in lieu of finding him guilty as a principal. Finally, the allegations of the indictment accommodate a "complicity" theory.

20

Second, the State attempted to identify Johnson as the second robber in the Cantrell home through physical evidence, and then put on testimony from Mrs. Cantrell that this robber had shot at her husband. The Alabama Court of Criminal Appeals observed in post-conviction proceedings that "[w]hile the shots of the second 'masked' robber were not the shots that killed the victim, there was no reasonable basis for the jury to doubt that the second robber had the intent to kill, attempted to kill, and actively participated in the killing." Johnson v. State, 612 So. 2d at 1298.

Johnson's "third man" theory turns on the notion that the evidence at trial could be interpreted to indicate that there were three robbers on the scene, and that Johnson was not the second but the third man to enter the Cantrell home, and hence was not one of the two men who allegedly shot at Mr. Cantrell. The State's main argument on this point was that there were two men at the scene, two men shot at Mr. Cantrell, Johnson was at the scene, and accordingly Johnson must have been the second man. Johnson counters that while the State may have had evidence that he was present at the scene, it had little solid evidence pointing to him as the second man. According to Johnson, a properly-instructed jury would have concluded that he did not participate in the shoot-out with Cantrell, found evidence of intentional murder lacking, and opted instead for felony murder, a non-capital offense.

21

Johnson's theory relies almost entirely on apparent confusion in portions of Mrs. Cantrell's trial testimony. As fairly described by the district court, see 58 F. Supp. 2d at 1314-15, Mrs. Cantrell's testimony was essentially as follows. Two intruders pushed past her into the house. The first man turned over a couch in the living room and took up a position behind it. Mrs. Cantrell fell to the floor at her husband's feet and was unable to see much of anything after that point. After a brief verbal exchange between her husband and the intruders, the second man opened fire. A barrage of shots was exchanged, followed by quiet. The first man said "come on in Bubba, I have got him." Just after that, Mr. Cantrell got off one last shot. Mrs. Cantrell heard a man say "Oh!," then heard shuffling as if "they were trying to help him out."

Mrs. Cantrell continued:

> A: It didn't take them long . . . to start moving over further towards the door.
>
> Q: Further towards the door?
>
> A: That is right.
>
> Q: So neither one of them was at the door when your husband fired the last shot?
>
> A: No, they wasn't.
>
> Q: They were not?

22

A. No.

Id. at 1331. Mrs. Cantrell speculated that the men "were probably going through things, looking for things." Id.

According to Johnson, this portion of Mrs. Cantrell's testimony is critical because she placed the two intruders away from the door at the moment when the last shot was fired and one of the intruders was hit. This is important, Johnson claims, because the State's evidence that Johnson was present at the scene was based largely on a bullet which allegedly went through the door and hit him. Thus, says Johnson, if both Mrs. Cantrell's testimony and the State's physical evidence were to be believed, there must have been three robbers rather than two, and Johnson could not have been the second man.[8] As the district court explained, "Johnson's story would go something like this. He and several others went to rob the Cantrells. He waited outside while two other men went in. They shot Cantrell, and thinking the fight was over called Johnson in. As he walked in, he was hit in the right side of his back by Cantrell's dying shot." 58 F. Supp. 2d at 1331. Under

---

[8]Johnson also insists that additional evidence could be drawn upon to support this conclusion, including Lindsey's testimony that Johnson had gone with "some friends" to get money; the position of the bullet wound on the right side of Johnson's back, a fact he says was consistent with coming in the door, not going out; and the perceived sequence and timing of the lull in shooting, the first man's direction to "come on in," and Cantrell's last shot. This evidence adds little to his argument, however; the "third man" theory, to the extent it is viable at all, turns on Mrs. Cantrell's trial testimony.

23

this scenario, Johnson was the "third man," did not participate in the shooting, and lacks the requisite intent to kill required for capital murder.

We agree with the district court that the balance of the trial evidence, viewed in a light most favorable to the prosecution, was sufficient to permit a rational trier of fact to find Johnson guilty of the essential elements of capital murder beyond a reasonable doubt. The balance of the evidence points to two intruders rather than three, with Johnson as the second man.

First, the evidence presented at trial was more than adequate to prove that Johnson was present at the scene and aided his associate in the killing. Evidence at the scene indicated that a bullet had been fired by the victim and had passed through a pane of glass in the carport door, only to disappear. A bullet of the type used by the victim, and with markings matching the type of gun used by the victim, was recovered from Johnson's back. The location of the bullet wound was consistent with the trajectory of the missing bullet, and fragments of glass found in the head of that bullet matched the physical characteristics of the window pane through which the shot had passed. This evidence was sufficient to allow a reasonable juror to infer beyond a reasonable doubt that Johnson was present during the gunfight which led to Mr. Cantrell's death.

Second, there was sufficient evidence to establish Johnson's intent to kill --

i.e., that he was the second man. The physical evidence indicated that an active

gun battle was waged between the victim and two intruders. A number of shots

from both sides passed through the carport door, indicating that one of the

intruders must have been firing from behind the door during part of the gunfight.

The fact that Johnson was struck by a bullet passing through this door allowed the

jury to infer that he was the shooter behind the door. Johnson's wound location in

his right mid-back was likewise consistent with the notion that he had taken up a

position behind the door during the fight and from there shot at Mr. Cantrell.

Moreover, Lindsey testified that Johnson visited his home the day after Mr.

Cantrell was murdered. According to Lindsey, Johnson had with him a "shiny"

.357 Magnum matching the description of the gun carried by one of Mr. Cantrell's

killers.[9] The next morning, Lindsey drove Johnson to a motel in Oxford, Alabama,

where they met some of Johnson's friends. Lindsey testified that Johnson told

them that he "had to get the hell out of Hartselle," and that he and others had gone

into a place to get some gold and that his buddy had been shot. According to

Lindsey, Johnson also stated: "I got shot, but I got off a couple of rounds, and I

---

[9]This testimony was partially corroborated by the introduction at trial of a nickel-plated Ruger .357 Magnum found in Johnson's possession a few days after the killing. Johnson's gun, when found, had only three rounds in it, consistent with the three rounds apparently fired by the intruder near the carport door.

believe I got that son of a bitch." The jury was entitled to believe, and presumably did believe, Lindsey's testimony. The record therefore contains what amounts to an admission by Johnson that he participated in an intentional killing. In light of the other evidence, a rational jury could conclude that it was Mr. Cantrell's murder which Johnson was describing.

In the end, virtually the only evidence arguably supporting the "third man" theory was the snippet of Mrs. Cantrell's testimony highlighted now by Johnson. But a reasonable jury could easily have downplayed any brief inconsistencies in Mrs. Cantrell's testimony, and based its conviction on the balance of the evidence pointing powerfully to Johnson as one of two men who shot at the victim. On this record, the State sufficiently proved that Johnson formed the requisite intent to kill for capital murder, and that he intended to participate, and did participate in Cantrell's intentional killing. Giving the jury's verdict the deference it is due under Jackson, Johnson is not entitled to relief on the ground that the evidence was insufficient to convict him of capital murder.

IV.

Johnson next argues that he is entitled to relief because his trial counsel were constitutionally ineffective. Most of Johnson's ineffectiveness arguments center on trial errors that Johnson attributes to his lawyers' lack of understanding of

Alabama law regarding the difference between capital and felony murder, and his lawyers' related failure to recognize the possibilities of a "third man" defense. His lawyers' purported errors include: (1) failing to argue that Johnson was not a participant in the shooting, but was instead a "third man"; (2) failing to argue that there was insufficient evidence of Johnson's alleged intent to kill Mr. Cantrell; (3) failing to request a felony murder jury instruction; (4) failing to object to the prosecutor's closing argument; and (5) improperly suggesting during their own closing argument that Johnson would be guilty of capital murder if he were merely present at the robbery and murder of Mr. Cantrell. We address these objections in turn.

## A.

The standard for ineffective assistance of counsel is well-settled. "First, the defendant must show that counsel's performance was deficient. This requires showing that counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment. Second, the defendant must show that the deficient performance prejudiced the defense. This requires showing that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable." Williams v. Taylor, 529 U.S. 362, 390, 120 S. Ct. 1495, 1511 (2000) (internal quotation marks omitted) (citing

27

Strickland v. Washington, 466 U.S. 668, 687, 104 S. Ct. 2052, 2064 (1984));

accord, Chandler v. United States, 218 F.3d 1305, 1312-1313 (11th Cir. 2000) (en

banc), cert. denied, 121 S. Ct. 1217 (2001).  The petitioner bears the burden of

proof on the "performance" prong as well as the "prejudice" prong of a Strickland

claim, and both prongs must be proved to prevail.  The Strickland test is not easily

met; as we have said, "the cases in which habeas petitioners can properly prevail

on the ground of ineffective assistance of counsel are few and far between.'"

Waters v. Thomas, 46 F.3d 1506, 1511 (11th Cir. 1995) (en banc) (citation

omitted).

To establish ineffective performance, a "petitioner must show that 'counsel's

representation fell below an objective standard of reasonableness.'"  Darden v.

Wainwright, 477 U.S. 168, 184, 106 S. Ct. 2464, 2473 (1986) (quoting Strickland,

466 U.S. at 668, 104 S. Ct. at 2065).  This Circuit reviews a lawyer's conduct

under the "performance" prong with considerable deference, giving lawyers the

benefit of the doubt for "heat of the battle" tactical decisions.  See Mills v.

Singletary, 161 F.3d 1273, 1285-6 (11th Cir. 1998) (noting that Strickland

performance review is a "deferential review of all of the circumstances from the

perspective of counsel at the time of the alleged errors"); see also Waters, 46 F.3d

at 1518 ("The test for ineffectiveness is not whether counsel could have done

more; perfection is not required. Nor is the test whether the best criminal defense attorneys might have done more. Instead the test is . . . whether what they did was within the 'wide range of reasonable professional assistance.'" (citation omitted)); Rogers v. Zant, 13 F.3d 384, 386 (11th Cir. 1994) (stating that "[w]hen reviewing whether an attorney is ineffective, courts should always presume strongly that counsel's performance was reasonable and adequate" (internal quotation marks omitted)).

This Court, sitting en banc, recently discussed this inquiry at length in Chandler:

> The standard for counsel's performance is reasonableness under prevailing professional norms. The purpose of ineffectiveness review is not to grade counsel's performance. . . . To state the obvious: the trial lawyers, in every case, could have done something more or something different. So, omissions are inevitable. But, the issue is not what is possible or what is prudent or appropriate, but only what is constitutionally compelled. . . . The petitioner must establish that particular and identified acts or omissions of counsel were outside the wide range of professionally competent assistance.

> Courts must indulge [the] strong presumption that counsel's performance was reasonable and that counsel made all significant decisions in the exercise of reasonable professional judgment. Thus, counsel cannot be adjudged incompetent for performing in a particular way in a case, as long as the approach taken might be considered sound trial strategy. Given the strong presumption in favor of competence, the petitioner's burden of persuasion -- though the presumption is not insurmountable -- is a heavy one. . . . [B]ecause counsel's conduct is presumed reasonable, for a petitioner to show that the conduct was unreasonable, a petitioner must establish that no

competent counsel would have taken the action that his counsel did take. . . .

In reviewing counsel's performance, a court must avoid using the distorting effects of hindsight and must evaluate the reasonableness of counsel's performance from counsel's perspective at the time. [I]t is all too easy for a court, examining counsel's defense after it has proved unsuccessful, to conclude that a particular act or omission of counsel was unreasonable.

218 F.3d at 1313-1316 (citations and internal quotation marks omitted).

Likewise, the "prejudice" prong is difficult to meet. To establish prejudice, a petitioner must show "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." Strickland, 466 U.S. at 694, 104 S. Ct. at 2068. A "reasonable probability is a probability sufficient to undermine confidence in the outcome." Id. A finding of prejudice requires proof of "'unprofessional errors' so egregious 'that the trial was rendered unfair and the verdict rendered suspect.'" Eddmonds v. Peters, 93 F.3d 1307, 1313 (7th Cir. 1996) (quoting Kimmelman v. Morrison, 477 U.S. 365, 374, 106 S. Ct. 2574, 2582 (1986)). As we recently explained, "habeas petitioners must affirmatively prove prejudice because '[a]ttorney errors come in an infinite variety and are as likely to be utterly harmless in a particular case as they are to be prejudicial.' '[T]hat the error had some conceivable effect on the outcome of the

proceeding' is insufficient to show prejudice." Gilreath v. Head, 234 F.3d 547, 551 (11th Cir. 2000) (quoting Strickland).

## B.

Johnson contends that his trial attorneys were ineffective by failing to attack the State's showing on intent and by failing to advance the "third man" theory. Johnson's argument starts from the premise that trial counsel did not understand the intent element of a capital murder charge, and therefore failed to recognize the significance of Mrs. Cantrell's trial testimony. This factual allegation also underlies Johnson's broader claim that trial counsel unreasonably advanced a flimsy defense -- that he was not present at the scene of the crime -- rather than a stronger defense based upon the his lack of intent to kill and his non-participation in the murder. The Alabama Court of Criminal Appeals explicitly found that "[t]rial counsel [were] aware that intent to kill was a required element of the capital offense." Johnson v. State, 612 So.2d at 1298. That court also found that "counsel made a reasoned, strategic decision not to argue . . . that Johnson was present but did not intend that the victim be killed" based upon a desire to avoid making alternative arguments to the jury as well as a "judgment that, as a practical matter,

31

there was little or no chance that the jury would fail to find . . . intent to kill if [it] concluded that [Johnson] had been at the scene." Id. at 1296.[10]

Johnson fails to meet his heavy burden of proving that his trial counsel performed unreasonably by pursuing the strategy that they did. On this record, the strategic choices made by trial counsel were reasonable and constitutionally adequate in the circumstances.

In formulating their strategy before trial, Johnson's lawyers were aware of statements by Johnson himself that he was the second man involved in the robbery and that he had shot at Mr. Cantrell.[11] Johnson's now-preferred "third man" defense, therefore, was not compatible with the information he conveyed to his lawyers at the time. See Williamson v. Moore, 221 F.3d 1177, 1180 (11th Cir. 2000) (counsel not ineffective in choosing particular defense strategy in capital

---

[10]Johnson, as noted above, contends that his trial counsel did not understand the elements of Alabama's capital murder scheme, and in particular did not understand the intent requirement. The district court, however, ruled that the record contains sufficient evidence to support a finding that at least one of Johnson's trial attorneys, DiGiulian, knew of the intent and participation requirements of an accomplice capital murder theory. The district court did conclude that the record would not support a finding that Johnson's trial counsel recognized the potential significance of Mrs. Cantrell's unclear testimony and what that testimony might mean for the intent requirement. But our inquiry is an objective one, see, e.g., Chandler, 218 F.3d at 1315-16, so the primary issue is not how Johnson's attorneys came to pursue the course that they did, but rather whether the course they actually pursued was one that "no competent counsel would have taken." Id. at 1315.

[11]As noted above, Johnson's trial attorneys testified and introduced notes pertaining to their decision to argue that Johnson was not present during the offense.

32

case where reasonable counsel would have determined that petitioner's alternative theory "was inconsistent with Petitioner's own description of the killing"). Notably, Johnson does not, and cannot, argue that these communications with his trial counsel are protected in this context by the attorney-client privilege. As we have explained, a party "waives its attorney-client privilege when it injects into this litigation an issue that requires testimony from its attorneys or testimony concerning the reasonableness of its attorneys' conduct." GAB Bus. Servs., Inc. v. Syndicate 627, 809 F.2d 755, 762 (11th Cir. 1987). By alleging that his attorneys provided ineffective assistance of counsel in their choice of a defense strategy, Johnson put at issue -- and thereby waived -- any privilege that might apply to the contents of his conversations with those attorneys to the extent those conversations bore on his attorneys' strategic choices.

In Laughner v. United States, 373 F.2d 326 (5th Cir. 1967), we rejected the argument of a § 2255 petitioner who asserted that his trial counsel should not have been permitted to testify regarding their confidential communications, even though the petitioner put those conversations at issue by attacking the attorney's performance. The petitioner sought to vacate his conviction by arguing that his attorney provided inadequate representation. The district court, in accordance with this Court's instructions, conducted a hearing at which it heard testimony from the

33

attorney who represented the petitioner at the time of his conviction. On the basis

of that testimony, the court denied the § 2255 motion. We affirmed, and rejected

the petitioner's claim of a violation of the attorney-client privilege:

> We are met with the remarkable contention that appellant's rights
> were infringed upon by reason of the fact that the attorney he charged
> with failure to represent him adequately at his arraignment and
> sentencing was called as a witness by the government and permitted
> by the court to testify in this post-conviction proceeding with respect
> to the factual issues raised by appellant's motion. Having demanded
> and obtained a factual judicial inquiry into his claim that the attorney
> appointed to render him the assistance of counsel for his defense
> failed to discharge his responsibilities properly, appellant now
> proposes to invoke the privilege accorded confidential
> communications between an attorney and his client to eliminate the
> one source of evidence likely to contradict his allegations. We are
> unable to subscribe to this proposition. The privilege is not an
> inviolable seal upon the attorney's lips. It may be waived by the
> client; and where, as here, the client alleges a breach of duty to him by
> the attorney, we have not the slightest scruple about deciding that he
> thereby waives the privilege as to all communications relevant to that
> issue. The rule that a client waives his privilege by attacking the
> attorney's performance of his duties seems to have been adopted
> unanimously by those courts which have dealt with the question. . . .
> There is no contention nor any indication in the record that the
> testimony elicited from the attorney in this case exceeded the scope of
> that waiver. Consequently, appellant's claim that his privilege was
> violated is baseless.

Id. at 327 & n.1 (citations omitted). Laughner is the law of this Circuit and has

been applied in subsequent decisions from this Court. See Crutchfield v.

Wainwright, 803 F.2d 1103, 1121 (11th Cir. 1986) (en banc) (Edmondson, J.,

concurring) (noting in § 2254 proceeding that "[a]lthough the attorney-client

privilege, in particular, and attorney-client confidentiality, in general, are important concerns due genuine deference, courts have never treated them as inviolable. When a defendant has challenged his conviction by asserting an issue that makes privileged communications relevant, he waives the privilege in respect to those communications."); Smith v. Estelle, 527 F.2d 430, 434 n.9 (5th Cir. 1976) (stating that "[n]otwithstanding the fact that counsel's decision to have his client take the stand may have involved communication with his client, [petitioner] would not be able to invoke the attorney-client privilege on remand in a post-conviction case" where petitioner alleged that he would not have testified at his trial but for the admission of a constitutionally invalid confession).

Simply put, when a habeas petitioner such as Johnson launches an attack on the reasonableness of his attorney's strategy in conjunction with a claim of ineffective assistance of counsel, he puts at issue his communications with counsel relating to those strategic choices. As Strickland itself emphasizes, the "reasonableness of counsel's actions may be determined or substantially influenced by the defendant's own statements or actions. Counsel's actions are usually based, quite properly, . . . on information supplied by the defendant . . . [and] . . . inquiry into counsel's conversations with the defendant may be critical to a proper assessment of counsel's . . . litigation decisions." 466 U.S. at 691, 104 S. Ct. at

35

2066; see also Chandler, 218 F.3d at 1318-19 ("Because the reasonableness of counsel's acts . . . depends critically upon information supplied by the [petitioner] or the [petitioner]'s own statements or actions, evidence of a petitioner's statements and acts in dealing with counsel is highly relevant to ineffective assistance claims." (citations and internal quotation marks omitted)). Although the precise boundaries of the waiver will vary from case to case, and in many instances will require careful evaluation by the district court, there should be no confusion that a habeas petitioner alleging that his counsel made unreasonable strategic decisions waives any claim of privilege over the contents of communications with counsel relevant to assessing the reasonableness of those decisions in the circumstances. The importance of that rule to proper resolution of a § 2554 proceeding is amply illustrated by this case -- the communications between Johnson and his trial counsel clearly reveal the incompatibility between what Johnson told his lawyers at the time and the theory of defense that his present lawyers insist their predecessors should have advanced.

Not only would a "third man" theory have been incompatible with the information supplied by Johnson to his counsel at the time, it would have had little foundation in other evidence available to counsel before the start of the trial. Mrs. Cantrell's pretrial testimony made no suggestion of a "third man." There was no

36

evidence from the preliminary hearing, or information gleaned from defense counsel's pretrial investigation, reasonably suggesting that a "third man" defense would be successful. Indeed, the available evidence supported a two-shooter robbery theory. Accordingly, trial counsel had little if any basis to pursue a "third man" theory. And without the "third man" theory, no plausible challenge could be made to the State's proof of intent, as the second man participated in a shoot-out and clearly displayed an intent to help his partner kill Mr. Cantrell.

Given the evidence available at the time and Johnson's own admissions, the strategy actually chosen by trial counsel -- a "Johnson was not there" defense -- was reasonable. Although the evidence tying Johnson to the scene of the crime was persuasive, it still was all circumstantial and not wholly iron-clad. Counsel knew that no eyewitness could identify Johnson as being present at the crime scene. The .357 magnum handgun that was found with Johnson at the motel in Oxford was not clearly matched to any of the bullets at the crime scene. The bullet found in Johnson's back could not itself be traced definitively to Mr. Cantrell's gun. A hair found in a brown cap allegedly worn by the Johnson during the robbery and murder did not match Johnson's hair. And boots allegedly worn by Johnson during the shooting did not contain glass fragments from a shattered glass

door pane.[12]  In short, Johnson's trial attorneys had a basis to argue that a sufficient link could not be forged between Johnson and the crime.  Their decision to pursue a "Johnson was not there" defense was within the range of professionally competent assistance.

Johnson nevertheless contends that, whatever the reasonableness of his lawyers' pretrial strategy, that strategy had to change once Mrs. Cantrell offered her testimony at trial.  As noted above, apparent confusion in Mrs. Cantrell's testimony arguably could suggest that Johnson was not one of the two shooters, but merely a third robber.   Johnson contends that Mrs. Cantrell's testimony created an opening to challenge the State's evidence on intent, and argues that it was unreasonable for his counsel not to have exploited this opportunity.

We are not persuaded that Johnson's trial attorneys provided professionally incompetent assistance by failing to alter their reasonable strategy in favor of pursuing a "third man" defense.  First, the relevant portion of Mrs. Cantrell's testimony was very brief, not altogether clear, and at odds with other portions of her account of the incident.  We cannot say that, under the circumstances, every

---

[12]The strongest evidence linking Johnson to the crime scene, glass found in the nose of the bullet removed from Johnson's back which shared the same refractive index as one of the shattered door panes at the Cantrell house, was not revealed to counsel until the eve of trial. Even that evidence, however, did not make unreasonable a defense strategy based on Johnson's absence from the scene.

38

reasonably competent attorney would have realized or attempted to take advantage of the potential significance of this portion of Mrs. Cantrell's testimony. Second, counsel were committed to the "Johnson was not there" defense, and to shift gears and argue in the alternative that Johnson <u>was</u> there, but only as the "third man," would have been risky.[13] The district court found that counsel had already presented to the jury the theory Johnson was not present at the robbery. <u>See</u> 58 F. Supp. 2d at 1344 (citing transcript of evidentiary hearing). That theory, as explained above, was reasonable. As we have explained in similar circumstances, "[a]lthough inconsistent and alternative defenses may be raised, competent trial counsel know that reasonableness is absolutely mandatory if one hopes to achieve credibility with the jury." <u>Harich v. Dugger</u>, 844 F.2d 1464, 1470 (11th Cir. 1988). To argue in the alternative that if Johnson was there, he was a "third man" and not one of the two shooters, might well have undercut the credibility of Johnson's lawyers with the jury.

Finally, there was little meaningful evidence beyond the highlighted portion of Mrs. Cantrell's testimony to aid a "third man" argument. Johnson himself could not have taken the stand, in light of his contrary admissions to his counsel. There

---

[13]Johnson's attorneys testified that they felt the presentation of alternative theories would have been mistaken.

remained Lindsey's testimony that Johnson had admitted to firing at Mr. Cantrell during the robbery. In addition, the physical evidence including the bullet holes in the carport door suggested that the second shooter was behind the door and not where Mrs. Cantrell seemingly indicated during her trial testimony. As the district court observed, even Mrs. Cantrell's trial testimony indicated, with the exception of a few inconsistencies, that two intruders were involved in the crime and that both participated in the murder of her husband. Given all of these circumstances, we do not find it performance error that counsel did not aggressively pursue a "third man" theory or other intent-related defenses during trial. See Waters, 46 F.3d at 1512 (performance inquiry "has nothing to do with what the best lawyers would have done. Nor is the test even what most good lawyers would have done. We ask only whether some reasonable lawyer at the trial could have acted, in the circumstances, as defense counsel acted at trial.").

C.

Johnson next contends that his trial counsel were ineffective because they did not request an instruction on the offense of felony murder. According to Johnson, with the option of a felony murder conviction, the jury might have acquitted on the capital murder charge to spare Johnson the death penalty if it had doubts that he shot at Mr. Cantrell. The district court did not decide whether this

40

failure to request a felony murder instruction was performance error, finding

instead no prejudice because Johnson failed to show a reasonable probability that

the jury would have returned a different verdict on the capital murder charge if

they had been presented with a felony murder jury instruction.[14]  We agree with

that analysis.

Relevant to this legal question are two Supreme Court decisions, Beck v.

Alabama, 447 U.S. 625, 100 S. Ct. 2382 (1980), and Schad v. Arizona, 501 U.S.

624, 111 S. Ct. 2491 (1991), which address the scope of a capital defendant's Due

Process right to lesser-included-offense jury instructions.  In Beck, the Supreme

Court found that an Alabama statute violated Due Process under the facts of that

case because it prohibited lesser-included-offense instructions in capital cases.  The

Court reasoned that "when the evidence unquestionably establishes that the

defendant is guilty of a serious, violent offense -- but leaves some doubt with

respect to an element that would justify conviction of a capital offense -- the failure

to give the jury the 'third option' of convicting on a lesser included offense would

seem inevitably to enhance the risk of an unwarranted [capital] conviction."  447

U.S. at 637, 100 S. Ct. at 2389.  The Court's fundamental concern was that a jury

---

[14]Johnson's trial lawyers testified that they did not consider whether to request a felony murder instruction.

41

convinced that the defendant had committed some violent crime, but not convinced that he was guilty of a capital crime, might nonetheless vote for a capital conviction if the only alternative was to set the defendant free with no punishment at all. See also Spaziano v. Florida, 468 U.S. 447, 455, 104 S. Ct. 3154, 3159 (1984) ("[t]he absence of a lesser included offense instruction increases the risk that the jury will convict . . . simply to avoid setting the defendant free . . . . The goal of the Beck rule . . . is to eliminate the distortion of the factfinding process that is created when the jury is forced into an all-or-nothing choice between capital murder and innocence.")

In Schad, the Court clarified that it is not per se constitutional error for a defendant to be denied a lesser-included-offense instruction in a capital case. The Court found no constitutional violation in the denial to a capital defendant of an instruction on the lesser-included-offense of robbery where the trial court did give a separate lesser-included-offense instruction for second degree murder. The Court reached this conclusion despite the defendant's argument that his theory of defense (he robbed the victim but did not murder him) supported a robbery instruction, and that, in the absence of the instruction, the jury may have convicted him of capital murder simply because they thought him guilty only of robbery and robbery was not available as an alternative.

In the words of the Court:

>   Petitioner makes much of the fact that the theory of his defense at trial was not that he murdered [the victim] without premeditation (which would have supported a second-degree murder conviction), but that, despite his possession of some of [the victim's] property, someone else had committed the murder (which would have supported a theft or robbery conviction, but not second-degree murder). Petitioner contends that if the jurors had accepted his theory, they would have thought him guilty of robbery and innocent of murder, but would have been unable to return a verdict that expressed that view. Because <u>Beck</u> was based on this Court's concern about "rules that diminish the reliability of the guilt determination" in capital cases, the argument runs, the jurors should have been given the opportunity "to return a verdict in conformity with their reasonable view of the evidence." . . .

>   The argument is unavailing, because the fact that the jury's "third option" was second-degree murder rather than robbery does not diminish the reliability of the jury's capital murder verdict. To accept the contention advanced by petitioner and the dissent, we would have to assume that a jury unconvinced that petitioner was guilty of either capital or second-degree murder, but loath to acquit him completely (because it was convinced he was guilty of robbery), might choose capital murder rather than second-degree murder as its means of keeping him off the streets. Because we can see no basis to assume such irrationality, we are satisfied that the second-degree murder instruction in this case sufficed to ensure the verdict's reliability.

>   That is not to suggest that <u>Beck</u> would be satisfied by instructing the jury on just any lesser included offense, even one without any support in the evidence. In the present case, however, petitioner concedes that the evidence would have supported a second-degree murder conviction, and that is adequate to indicate that the verdict of capital murder represented no impermissible choice.

501 U.S. at 647-48, 111 S. Ct. at 2505 (citations omitted).  Schad, therefore, rejects

the proposition that Due Process always entitles a defendant to each lesser-

included-offense instruction which may fit the facts of his case.

Here, the question is different, in that we focus not on whether there was a

Due Process violation, but rather whether the failure of Johnson's trial attorneys to

ask for a felony murder instruction amounted to Strickland performance error and

prejudice.[15]  Johnson's argument, drawing on Beck, is that the absence of a felony

murder instruction made a capital murder conviction more likely because the other

charges presented to the jury (robbery and intentional murder) did not allow for a

conviction on an unintentional murder theory -- a theory corresponding to the

"third man" defense.  Citing the 9-3 jury vote for a life rather than death penalty

recommendation, Johnson contends that the jury may have doubted the strength of

the evidence of his intent to kill, but had no alternative "lesser" offense beyond

robbery.

Having reviewed the record, we cannot say that Johnson was prejudiced by

the absence of a felony murder instruction.  Like the district court, we can find no

logical basis to conclude that an additional alternative charge would have led a

_____

[15]There was no constitutional violation under Schad, because the jury in Johnson's case did receive lesser-included instructions on robbery and intentional murder.

rational jury down a different path. The jury already was presented with non-capital alternatives (intentional murder and robbery) and still found Johnson guilty of capital murder. A felony murder instruction would not have changed the standard for a conviction on capital murder, and so for an objective and rational jury -- and we must presume this was such a jury -- an instruction on that offense should not have changed the outcome. See Kilgore v. Bowersox, 124 F.3d 985, 995 (8th Cir. 1997) (finding no prejudice where capital defendant charged his lawyer with ineffective assistance for not requesting a lesser-included charge on second degree murder).[16] Johnson's belief that the jury might have doubted the evidence of his intent to kill, but then nevertheless chosen to convict him for capital murder because it thought the only alternative was robbery and that offense would be too minor, is pure speculation, and highly strained speculation at that.

Moreover, as discussed above, there is little evidentiary foundation for Johnson's belief that the jury in his case might have been inclined to convict for felony murder in lieu of the other offenses. The weight of the evidence pointed to only two men, not three, with Johnson as either (1) one of the two men and therefore guilty of capital murder, or (2) not one of them and therefore not guilty

---

[16]We have found ineffective assistance where trial counsel did not request a manslaughter instruction in a murder case where there was evidence suggesting the defendant killed the victim in the heat of passion and there was little evidence of premeditation. See Young v. Zant, 677 F.2d 792, 798-99 (11th Cir. 1982). That is not the situation we have here.

45

altogether.  That issue was the focus of the evidence and of the parties' arguments before the jury.  In this context, unintentional murder was not so viable an option for the jury that the absence of an instruction on felony murder amounts to <u>Strickland</u> prejudice.

D.

Johnson next claims that his trial lawyers were ineffective by misstating the law during their closing argument and also by failing to make a key objection during the prosecutor's closing argument.  Johnson contends that these failures stemmed from his attorneys' failure to understand the intent requirement of Alabama's capital murder scheme.  This argument, like many of Johnson's other objections, ultimately relates to the "third man" theory.  We find no error entitling Johnson to relief.

Johnson contends that a statement by his counsel during closing argument improperly suggested to the jury that he could be convicted for capital murder if he were merely present during the robbery.  The challenged passage is as follows:

> You are going to have to go back there, and you are
> going to have to find, in order to convict and find Keith
> guilty, you are going to have to find that the State has
> proved an intentional killing occurred, a forcible robbery
> or intent to rob, and going to have to find that Keith was
> one of the men that was out there.  That is what you are
> going to have to do in order to find each and every one of

46

those beyond a reasonable doubt and to a moral certainty. Each one of you is going to have to do that.

In analyzing this claim, we must evaluate defense counsel's actions in context rather than focusing on a single isolated passage. Before beginning their closing arguments, trial counsel asked the court to give a three-paragraph instruction which emphasized the state's burden to prove beyond a reasonable doubt that Johnson was guilty of an <u>intentional killing</u> in order to convict him of capital murder. The court gave the instruction as requested. Moreover, references to finding Johnson guilty of capital murder if he were present at the scene need not be read as concessions that the capital charge could be proved on a felony murder theory. Rather, the closing argument fit the facts of the case and Johnson's primary defense -- that he was not present at the Cantrell robbery and was not one of the two shooters.

In any event, even if we assumed performance error, any prejudice to Johnson was cured by the trial court's jury instructions. Prior to closing argument, the trial judge reminded the jury that the arguments of the lawyers were not to be taken as the law applicable to the case. Following closing argument, the judge again instructed the jury that it was the court's duty to decide and define the law. During his instructions, the judge repeatedly and emphatically instructed the jury that a necessary element of the capital offense was that the defendant had

committed an intentional killing, or had intentionally aided and abetted an intentional killing and repeatedly emphasized that the jury could not convict the defendant of capital murder unless it was convinced that these requirements had been proved beyond a reasonable doubt. Given these instructions, which Johnson does not contend are inaccurate, we find no prejudice from the isolated passage in his attorneys' closing argument that Johnson now highlights. See United States v. Smith, 918 F.2d 1551, 1562 (11th Cir. 1990) (stating that "[b]ecause statements and arguments of counsel are not evidence, improper statements can be rectified by the district court's instruction to the jury that only the evidence in the case be considered"); Shriner v. Wainwright, 715 F.2d 1452, 1459 (11th Cir. 1983) (noting that "with a properly instructed jury, there is nothing to show the jury relied on the prosecutor's remarks," and citing Grizzell v. Wainwright, 692 F.2d 722, 726-27 (11th Cir. 1982) for proposition that "'[a] jury is presumed to follow [the] jury's instructions as to evidence it may consider'"); see also United States v. Gainey, 111 F.3d 834, 836-37 (11th Cir. 1997) ( prosecutors inappropriate comment not prejudicial where it "was mitigated by the district court's curative instructions"); United States v. Barshov, 733 F.2d 842, 846-47 (11th Cir. 1984) (same).

For similar reasons, we reject on prejudice grounds Johnson's allegation that his trial attorneys were constitutionally ineffective because of their failure to object

to certain comments made by the prosecutor in closing argument. In his argument, the prosecutor said the following:

> His honor will charge you in this case, ladies and gentlemen, concerning complicity. He will charge you in this case that if these two men went in there, and if they went in there to rob this dear lady and her husband, the act of one is the act of both, the act of one is the act of all, and what one does the other one is responsible for. You listen to his charge. When those two men busted through that door out there that night, everything that each one of them did the other one was responsible for under the law of the State of Alabama, and one is just as equally guilty for the death of this man as the other.

58 F. Supp. 2d at 1350. According to Johnson, the prosecutor invited the jury to convict on evidence sufficient to support only a felony murder charge, a statement both wrong on the law and wrong on the facts.

The prosecutor's statement is surely wrong under Alabama's capital murder statute. Specific intent to kill is required for conviction. However, we find no prejudice from trial counsel's failure to object to this statement. First, the statement did not undercut Johnson's defense -- that he was not present and was not one of the two robbers who shot Mr. Cantrell. Second, as discussed above, the trial evidence was generally inconsistent with a felony murder argument, so the likelihood that the jury would have considered the case differently in light of the prosecutor's comments is minimal. Third, and most importantly, any possible

49

prejudice was cured by the trial court's correct jury instructions. Under our caselaw, as noted above, improper statements during argument can be cured by clear and accurate jury instructions like those given here. The trial judge plainly instructed the jury that the lawyers' arguments were not to be taken as descriptions of the law, and gave the jury proper instructions on the offenses for which Johnson was charged. We cannot say, on this record, that there was a reasonable probability that the outcome of the trial would have been different if Johnson's counsel had objected to the prosecution's remarks. Accordingly, there is no Strickland prejudice.

E.

Johnson next alleges ineffectiveness in his trial attorneys' incomplete cross-examination of David Lindsey. First, Johnson claims that his counsel failed to identify for the jury certain asserted discrepancies between statements Lindsey had given to police -- statements that trial counsel allegedly had in their possession -- and testimony by Lindsey at the preliminary hearing and at trial. Second, Johnson asserts that his attorneys did not adequately impeach Lindsey when they failed to take full advantage of an alleged affair between Johnson and Lindsey's wife; by not further inquiring into a criminal investigator's report which said that Lindsey was considered by some to be a "thief"; and by not inquiring into evidence that he

50

was not well thought of when he left his employment as an oil rigger. Finally,

Johnson argues that counsel inappropriately failed to call as witnesses several

people who had shared the motel room with him in order to rebut Lindsey's

testimony regarding Johnson's alleged admissions.

The Alabama Court of Criminal Appeals considered and rejected these

objections in the state post-conviction proceeding. As that court explained:

> Defense counsel demanded a preliminary hearing for
> discovery purposes to cross-examine prosecution
> witnesses before trial. One of those witnesses was David
> Lindsey. Defense counsel reviewed that preliminary
> hearing transcript, including Lindsey's testimony, in
> detail before trial. They also interviewed the officer in
> charge of the investigation several times, and they talked
> a great deal with Johnson about the facts of the case.
> Their conduct of the defense was based upon what
> Johnson told them, and Johnson told them "the whole
> story." In addition to all those efforts, defense counsel
> employed an investigator to help them find any useful
> impeachment information about Lindsey. That
> investigator worked on the case for more than nine
> weeks. Defense counsel effectively cross-examined
> David Lindsey. Defense counsel brought out a
> contradiction between Lindsey's trial testimony and the
> testimony that he had given at the preliminary hearing.
> Defense counsel suggested that Lindsey was biased
> against Johnson because Johnson and Lindsey's wife had
> had an affair. Trial counsel forced Lindsey to admit that
> he had been convicted of illegal possession of controlled
> substances, specifically methamphetamines, and that
> Lindsey shot the drug into his arms. As defense counsel
> argued to the jury, "Mr. Lindsey was a man who
> mainlined speed, shot it up his arm."

612 So. 2d at 1300.

Especially in light of these findings, we find no performance error. Johnson's attorneys adequately prepared for Lindsey's testimony, even hiring an investigator, and challenged Lindsey's character, motives, and credibility on cross. Absent a showing that real impeachment evidence was available and could have been, but was not, pursued at trial, Johnson cannot establish that the cross conducted by his attorneys fell outside the range of professionally competent assistance. Claims that an attorney should have cross-examined further on inconsequential matters do not establish constitutionally deficient performance. See Mills v. Singletary, 63 F.3d 999, 1021 n.36 (11th Cir. 1995). Many of the inconsistencies highlighted by Johnson are, on this record, inconsequential. As the district court put it, trial counsel's "actual cross cast a general shadow over Lindsey's character and veracity by bringing out his drug use and hinting at a motive for lying in the form of an affair between the petitioner and Johnson's wife. The court cannot imagine that a jury unpersuaded by this information would have rejected Lindsey's testimony based on inconsistencies in some rather minor details." 58 F. Supp. 2d at 1356.

Moreover, when an attorney "substantially impeache[s]" the witness, no claim for ineffectiveness can succeed unless the petitioner comes forward with

"specific information" which "would have added to the impeachment of the State's witnesses." Aldrich v. Wainwright, 777 F.2d 630, 636-37 (11th Cir. 1985); see also Card v. Dugger, 911 F.2d 1494, 1506 (11th Cir. 1990). Without that kind of information, a petitioner cannot meet his burden of proving a Strickland violation. Johnson's arguments fail on this basis as well.

In particular, Johnson's argument that the other persons at the motel would have discredited Lindsey's testimony regarding Johnson's admissions is unsubstantiated by the record. Johnson has offered no evidence that any of the individuals who were present with him in the Oxford motel would have testified in a way that was inconsistent with the testimony given by Lindsey. Johnson points only to unsworn statements taken from the men which did not expressly confirm Lindsey's testimony about Johnson's admissions. But none of these statements indicates that Johnson did not admit to the crime, and none directly contradicts Lindsey's testimony. See Card, 911 F.2d at 1506 (finding no ineffectiveness where "none of the evidence that petitioner claims could have been introduced directly contradicts or undermines the testimony of" the State's witness). Johnson offers only speculation that the missing witnesses would have been helpful. This kind of speculation is "insufficient to carry the burden of a habeas corpus petitioner." Aldrich, 777 F.2d at 636.

For all of the foregoing reasons, Johnson cannot establish a Strickland

violation based on the conduct of his trial counsel.[17]

V.

Johnson's assertion that his appellate counsel, Mays, was constitutionally

ineffective requires little separate discussion. Johnson contends that appellate

counsel made two main errors. First, according to Johnson, counsel performed

inadequately by presenting only a few grounds for reversal when other, more

substantial objections were available. Second, Johnson contends that counsel's

brief to the Supreme Court of Alabama was merely a copy of his brief to the Court

of Criminal Appeals, without any attempt to respond to the reasoning of the lower

---

[17]Johnson is plainly not entitled to relief under United States v. Cronic, 466 U.S. 648, 104 S. Ct. 2039 (1984) (holding that Strickland prejudice will be presumed if: (1) counsel is completely denied; (2) counsel is denied at a critical stage of trial; or (3) counsel "entirely" fails to subject the prosecution's case to meaningful adversarial testing). As best we can tell, Johnson makes two separate arguments based on Cronic. First, he contends that his attorneys' errors, viewed in the aggregate, constitute prejudicial ineffective assistance of counsel even if none of those errors, standing alone, constitutes a Strickland violation. We disagree; to the extent Johnson's attorneys committed performance errors, those errors in the aggregate do not warrant setting aside his conviction. Second, Johnson asserts that his trial attorneys' failure to challenge the State's evidence on the intent issue represents a "fail[ure] to subject the prosecution's case to meaningful adversarial testing" within the meaning of Cronic. 466 U.S. at 659, 104 S. Ct. at 2047. But Johnson cites no case providing relief under Cronic based on such a narrow attack on his counsel's decision-making. Cronic applies when counsel "entirely" fails to challenge the prosecution, and that is indisputably not so here. Nor do the cases cited by Johnson have any applicability to the facts of this proceeding. Compare Young v. Zant, 677 F.2d 792, 798 (11th Cir. 1982) (pre-Cronic decision finding ineffective assistance where attorney conceded client's guilt). Finally, as discussed above, we find no performance error in the choices made by Johnson's trial counsel, so the question of whether we must "presume" prejudice never even arises.

54

court or advance the arguments that (Johnson now feels) should have been advanced. Johnson insists that, by simply submitting to the Alabama Supreme Court his prior brief, counsel tacitly assented to the Court of Criminal Appeals's unpersuasive analysis, and provided no assistance whatsoever in Johnson's effort to obtain direct review from the state supreme court.

The standards applicable to Johnson's claims of ineffectiveness against trial counsel apply equally to the charges leveled against his appellate lawyer. See Heath v. Jones, 941 F.2d 1126, 1130 (11th Cir. 1991); Orazio v. Dugger, 876 F.2d 1508, 1513 (11th Cir. 1989). To prevail, Johnson must demonstrate both that his appellate counsel's performance fell below reasonable professional standards and that he was prejudiced by his attorney's substandard performance. See Strickland, 466 U.S. at 687, 104 S. Ct. at 2064.

Johnson cannot meet this demanding test. Appellate counsel's choices regarding which issues to press on appeal were adequate in the circumstances. Johnson argues that the two guilt-related arguments raised as errors by his appellate counsel -- that a particular juror should not have been struck for cause and that a motion for judgment of acquittal should have been granted because the trial evidence was insufficient to support his conviction -- were two of the less serious errors that could have been raised. Johnson further claims that, rather than

the faulty and weak arguments actually raised, appellate counsel should have asserted many of the more substantial claims presented in this petition.

It is difficult to win a <u>Strickland</u> claim on the grounds that appellate counsel pressed the wrong legal arguments where the arguments actually pursued were reasonable in the circumstances. We have emphasized that even in a death penalty case, counsel must be "highly selective about the issues to be argued on appeal . . . ." <u>United States v. Battle</u>, 163 F.3d 1, 1 (11th Cir. 1998). The district court, having considered the record and Mays's testimony during the state post-conviction proceeding, found that Mays had carefully considered many of the claims now raised in appeal, but ultimately chose to pursue the claims he felt were most likely to prevail and winnow out the arguments he thought were less persuasive. We agree. In any event, there was little persuasive foundation, and little likelihood of success, for many of the arguments Johnson now suggests should have been pressed on appeal.

Likewise, we reject Johnson's claim that appellate counsel was ineffective by failing to address specifically in his petition for a Writ of Certiorari to the Supreme Court of Alabama the findings and conclusions reached by the Court of Criminal Appeals. Counsel's brief was sufficient to alert the Alabama Supreme Court to the issues reasonably raised before the Court of Criminal Appeals.

56

Moreover there has been no showing regarding the effect, if any, that a different brief would have had on the outcome of proceedings. Johnson, in short, does not establish a <u>Strickland</u> violation on the part of his appellate counsel.

## VI.

Johnson next asserts that the State violated the rule set forth in <u>Brady v. Maryland</u>, 373 U.S. 83, 83 S. Ct. 1194 (1963), when it failed to produce "all information favorable to the defense" as requested in Johnson's pre-trial discovery motion. The items Johnson points to as <u>Brady</u> material are: (1) a report prepared by the Alabama Bureau of Investigation ("ABI"), which suggested that the police had identified suspects other than Johnson and contained statements taken from the men present in the motel room at the time of Johnson's arrest;[18] and (2) documentary evidence that the State was investigating two other suspects in connection with the murder of Mr. Cantrell.[19] Johnson claims that the suppressed information could have been used to impeach the testimony of two of the state's witnesses, Lindsey and Sergeant Newell.

---

[18]In the report, the chief investigator, Sergeant Newell, noted that an (unnamed) informant had told authorities that Garland and Wayne McCulloch "did the shooting."

[19]This evidence includes: (1) an undated set of notes which indicated that a woman named Louise Blevin told someone that Garland McCulloch would do anything for money, had guns, and was a companion to Johnson and others; (2) a sheet of paper with "Garland #1" scribbled on it; and (3) a page of notebook paper with the names Ray McCulloch, Garland McCulloch, Wayne McCulloch, and Jerry, along with the words "beverages," "Hartselle," and "79 Olds."

The Brady legal framework is well-settled. "There are three essential components of a true Brady violation: the evidence at issue must be favorable to the accused, either because it is exculpatory, or because it is impeaching; that evidence must have been suppressed by the State, either willfully or inadvertently; and prejudice must have ensued." Strickler v. Greene, 527 U.S. 263, 281, 119 S. Ct. 1936, 1948 (1999). Thus, to prove a Brady claim, a party must show: "(1) suppression by the prosecution (2) of exculpatory evidence (3) material to the issues at trial or sentencing." Kennedy v. Herring, 54 F.3d 678, 682 (11th Cir. 1995). Included in the materiality prong of Brady analysis is a requirement that the petitioner make a showing of actual prejudice. See id. To demonstrate prejudice, the petitioner must "convince us that there is a reasonable probability that the result of the trial would have been different if the [allegedly suppressed items] had been disclosed to the defense. In other words, the question is whether the favorable evidence could reasonably be taken to put the whole case in such a different light as to undermine confidence in the verdict." High v. Head, 209 F.3d 1257, 1267 (11th Cir. 2000) (citations and internal quotation marks omitted); see also Strickler, 527 U.S. at 289-90, 119 S. Ct. at 1952 ("'the question is not whether the defendant would more likely than not have received a different verdict with the evidence, but

58

whether in its absence he received a fair trial, understood as a trial resulting in a verdict worthy of confidence") (citation omitted).[20]

Johnson does not contend that the items in question are exculpatory in the sense that they would have been used in the defense's case-in-chief. Nor does he contend that, if he had access to these items, he would have used them as leads to conduct an investigation into the identity of the "real" shooters or even the identity of the unnamed source referenced in the ABI report. Instead, Johnson contends only that they could have been used for impeachment during cross examination. The duty to disclose can include impeachment evidence. See United States v. Bagley, 473 U.S. 667, 676, 105 S. Ct. 3375, 3380 (1985). The problem for Johnson, however, is that he fails to show that the State's failure to produce these materials caused him prejudice.

Johnson contends that he could have used the ABI report to impeach Sergeant Newell. According to Johnson, information contained in the report not only suggests the involvement of other suspects, particularly Garland and Wayne McCulloch, but also contains an allegation (attributed to the unnamed source) that the McCulloch brothers "did the shooting." Johnson argues that this evidence

---

[20]Materiality is to be determined collectively, not item-by-item. See United States v. Scheer, 168 F.3d 445, 452 (11th Cir. 1999).

tends to establish that the two McCullochs were the shooters, and that he, at best, was the "third man." But Johnson makes no effort to explain, let alone demonstrate from the record, how he permissibly could have used this information from the ABI report for the narrow purpose of discrediting specific direct testimony by Sergeant Newell during a cross-examination of that witness. Nor does Johnson explain how his asserted inability to "impeach" Sergeant Newell with this allegation from an unnamed source was so devastating to the defense as to undermine confidence in the verdict. To reiterate, Johnson does not argue that the report as a whole or the underlying suggestion from the unnamed source that the McCullochs "did the shooting" would have been admissible as substantive evidence for the defense.[21] Even assuming that the report, and in particular the unnamed source's reference to the McCullochs as doing the shooting, could properly have been invoked at all during the cross-examination of Sergeant Newell, its use at that point and thereafter during the trial would have been extremely limited, and its potential persuasive value would have been correspondingly limited.

---

[21]At oral argument, Johnson's present counsel conceded that the actual report would not be admissible.

Of course, to the extent the ABI report or the investigative notes merely suggested that there may have been participants other than Johnson in the attempted robbery of the Cantrells, that information does not establish that Johnson was not involved, or indeed that he was not the "second man." More to the point, we are unconvinced that evidence of that sort -- identifying additional participants in the crime, but not directly disputing Johnson's presence or status as the "second man" -- could have been used to discredit in any meaningful way Sergeant Newell's testimony. Significantly, there was already evidence before the jury regarding the alleged involvement of other participants.

As for the statements of the men present in the motel room with Johnson, a similar analysis applies. Johnson asserts that these statements would have been useful to impeach Lindsey, because they are inconsistent with Lindsey's testimony. But none of these witness statements directly contradicted Lindsey's testimony about Johnson's admissions. These witness statements do not corroborate Lindsay's story, and in that sense might have be used to challenge Lindsey's testimony. But the statements do not actually dispute Lindsey's testimony regarding Johnson's admissions, and as noted above Lindsey's credibility was already amply called into question during cross-examination. Johnson fails to show that the unavailability of the statements for the limited purpose of using them

in cross examination was so serious as to undermine confidence in the verdict. Accordingly, having reviewed the record, we find that the allegedly suppressed items -- viewed individually or collectively -- were not material, and hence there was no Brady violation entitling Johnson to relief. See Moore, 240 F.3d at 915-16 (no Brady violation entitling petitioner to habeas relief where petitioner failed to show prejudice from the allegedly suppressed items).

## VII.

Johnson's final claim on appeal is that the jury instructions violated the Supreme Court's holding in Cage v. Louisiana, 498 U.S. 39, 111 S. Ct. 328 (1990) (per curiam), overruled in part, Estelle v. McGuire, 502 U.S. 62, 112 S. Ct. 475 (1991), because it lowered the government's burden below proof beyond a reasonable doubt. We find no error entitling Johnson to relief.[22]

In a criminal case, the government must prove each element of a charged offense beyond a reasonable doubt. See, e.g., In re Winship, 397 U.S. 358, 361, 90 S. Ct. 1068, 1072 (1970). Although a court must instruct the jury that a defendant's guilt has to be proven beyond a reasonable doubt, the Supreme Court has stated that "the Constitution neither prohibits trial courts from defining

---

[22]There is no dispute that Johnson's attorneys failed to object to the trial court's reasonable doubt instruction and failed to raise the issue on direct appeal. To excuse this default, Johnson again claims ineffective assistance of counsel. We need not resolve that claim, however, because we find the instruction constitutionally acceptable.

reasonable doubt nor requires them to do so as a matter of course." Victor v. Nebraska, 511 U.S. 1, 5, 114 S. Ct. 1239, 1243 (1994). If a trial court does attempt to define reasonable doubt, it must explain the standard correctly, although "the Constitution does not require that any particular form of words be used in advising the jury of the government's burden of proof." Id.

When reviewing the correctness of reasonable-doubt charges, the Supreme Court has phrased the proper constitutional inquiry as "'whether there is a reasonable likelihood that the jury understood the instructions to allow conviction based on proof insufficient to meet the Winship standard.'" Harvell v. Nagle, 58 F.3d 1541, 1542-43 (11th Cir. 1995) (quoting Victor, 511 U.S. at 6, 114 S. Ct. at 1243). We consider the instruction as a whole to determine if the instruction misleads the jury as to the government's burden of proof. See id.; see also Victor, 511 U.S. at 5-6, 114 S. Ct. at 1243 (instructions must be "taken as a whole"); Cage, 498 U.S. at 41, 111 S. Ct. at 329 (explaining that "[i]n construing the instruction, we consider how reasonable jurors could have understood the charge as a whole").

At the close of the evidence at Johnson's trial, the judge gave the jury a lengthy instruction on reasonable doubt. Johnson contends that the instruction was flawed because, in the course of the instruction, the trial judge (1) equated "beyond reasonable doubt" with "moral certainty"; (2) referred to a reasonable doubt as an

63

"actual and substantial one," or a "a doubt for which a good reason can be given or assigned"; and (3) said that in "the final analysis" each juror would have to look into his "own heart and mind" for the answer. Johnson asserts that these comments effectively lowered the burden of proof below the reasonable doubt standard.

In Cage, the petitioner had been convicted of first degree murder and sentenced to death. During the trial, the court instructed the jury as follows:

> If you entertain a reasonable doubt as to any fact or element necessary to constitute the defendant's guilt, it is your duty to give him the benefit of that doubt and return a verdict of not guilty. Even where the evidence demonstrates a probability of guilt, if it does not establish such guilt beyond a reasonable doubt, you must acquit the accused. This doubt, however, must be a reasonable one; that is one that is founded upon a real tangible substantial basis and not upon mere caprice and conjecture. It must be such doubt as would give rise to a grave uncertainty, raised in your mind by reasons of the unsatisfactory character of the evidence or lack thereof. A reasonable doubt is not a mere possible doubt. It is an actual substantial doubt. It is a doubt that a reasonable man can seriously entertain. What is required is not an absolute or mathematical certainty, but a moral certainty.

498 U.S. at 40, 111 S. Ct. at 329 (emphasis in original omitted)

The Court held that this instruction ran afoul of Winship. According to the Court, even though the charge did at one point instruct the jury that to convict the defendant, guilt must be found beyond a reasonable doubt, it improperly went on to equate a reasonable doubt with a "'grave uncertainty'" and an "'actual substantial

doubt.'" "It is plain to us," said the Court, "that the words 'substantial' and 'grave,' as they are commonly understood, suggest a higher degree of doubt than is required for acquittal under the reasonable-doubt standard. When those statements are then considered with the reference to 'moral certainty,' rather than evidentiary certainty, it becomes clear that a reasonable juror could have interpreted the instruction to allow a finding of guilt based on a degree of proof below that required by the Due Process Clause." Id. at 41, 111 S. Ct. at 329-30.

Cage is limited precedent because it has been modified by subsequent decisions. In Cage, as noted above, the Court had merely asked whether a reasonable jury, viewing the challenged instruction as a whole, "could" have construed it in a way that would violate Winship. In Estelle, however, the Court explained that the appropriate standard is whether there exists a "reasonable likelihood" that the jury read the instruction to lower the required threshold. 502 U.S. at 72, 112 S. Ct. at 482; see also Victor, 511 U.S. at 5-6, 114 S. Ct. at 1243 ("The constitutional question . . . is whether there is a reasonable likelihood that the jury understood the instructions to allow conviction based on proof insufficient to meet the Winship standard.").

In Victor, the Court used that new test to find that a trial court's use of the term "moral certainty" did not result in a constitutional violation on the record

before it.  The Court reasoned that "[w]e do not think it reasonably likely that the jury understood the words 'moral certainty' either as suggesting a standard of proof lower than due process requires or as allowing conviction on factors other than the government's proof."  Id. at 16, 114 S. Ct. at 1248.  In a companion case, Sandoval v. California, 511 U.S. 1, 114 S. Ct. 1239 (1994), the Court rejected the argument that equating a reasonable doubt with an "actual and substantial" doubt lowered the degree of doubt permissible for a conviction.  Although the Sandoval Court found the disputed language "somewhat problematic," it concluded that "the context makes clear that 'substantial' is used in the sense of existence rather than magnitude of the doubt."  Id. at 19-20, 114 S. Ct. at 1250.

Here, the trial judge employed "beyond a reasonable doubt" and "to a moral certainty" interchangeably and even informed the jury that the two terms were synonymous.  But other portions of the instruction ensured that the "moral certainty" language would not reasonably be understood to lower the State's burden.  We have specifically recognized that the use of the term "moral certainty" in a reasonable doubt instruction is not fatal.  See Felker v. Turpin, 83 F.3d 1303, 1309 (11th Cir. 1996) (trial court's definition of reasonable doubt as "'doubt which is based on the evidence, a lack of evidence or a conflict in the evidence'" and "'doubt which is reasonably entertained as opposed to vague or fanciful or

66

farfetched doubt,' served to erase any taint created by the term 'moral certainty' and to thus place it beyond the potential for constitutional harm"); Harvell, 58 F.3d at 1543 (trial court's statements that reasonable doubt had to be derived from the evidence and that reasonable doubt could not be "fanciful, vague, whimsical, capricious, conjectural or speculative" cured any potential constitutional harm associated with the term "moral certainty").

The instruction in this case included substantial language echoing the key phrases in Felker and Harvell. Specifically, the trial judge in this case repeatedly informed the jury that it could not convict Johnson unless the evidence presented to it was inconsistent with any reasonable theory of innocence; the judge also repeatedly instructed the jury not to go beyond the evidence and engage in speculation in order to find Johnson guilty.[23] The instruction as a whole, which emphasized the jury's obligation to focus on the evidence presented in court and made abundantly clear that a conviction could not be based on speculation,

---

[23]For example, the trial court advised the jury that "it [is] the duty of the State to show . . . to the exclusion of every other reasonable hypothesis every circumstance necessary to show that the Defendant is guilty." The court added that "if, after hearing all the evidence, your mind is left in such a state that you must resort to speculation or guesswork as to the Defendant's guilt or innocence, then the State has not proved to you beyond a reasonable doubt that the Defendant is guilty, and you must acquit." And the court emphasized that "a reasonable doubt is not a fanciful doubt. It is not a vague or speculative or uncertain doubt . . . ." Similar language appears throughout the court's detailed instruction.

67

convinces us that it was not reasonably likely that the jury understood the

instructions to allow conviction based on proof insufficient to satisfy Winship.

The trial judge's references to "actual and substantial" doubt do not change

that conclusion.  As we said in Harvell:

> Although the use of the term "actual and substantial doubt" is
> somewhat problematic and perhaps even ill-advised, the Supreme
> Court made clear, subsequent to Cage, that the use of such a term in
> the proper context, bolstered by adequate explanatory language, can
> survive constitutional scrutiny.  See Victor . . . . The instruction
> challenged in Victor provided in part:
>
>> A reasonable doubt is an actual and substantial doubt
>> arising from the evidence, from the facts or
>> circumstances shown by the evidence, or from the lack of
>> evidence on the part of the state, as distinguished from a
>> doubt arising from mere possibility, from bare
>> imagination, or from fanciful conjecture.
>
> The Supreme Court held that the actual and substantial doubt
> language did not violate Victor's due process rights because the rest
> of the sentence made clear that substantial was being used in "the
> sense of existence rather than magnitude of the doubt."  In other
> words, in context, substantial meant actual or real rather than
> abundant or plentiful.
>
> The surrounding language in the trial court's instruction in
> Harvell's case likewise established that substantial meant real and not
> imaginary.  The trial court accomplished this in two ways.  First, as in
> Victor, the instruction provided that substantial doubt arises from the
> evidence itself, stating that reasonable doubt had to be derived from
> the evidence, lack of evidence, or any part of the evidence.  Second,
> Harvell's instruction stated that reasonable doubt cannot be fanciful,
> vague, whimsical, capricious, conjectural or speculative.

Id. at 1543 (footnote omitted).

As in Harvell, the surrounding language in the charge given the jury in the present case, contrasting an "actual and substantial" doubt with other kinds of doubt, makes clear that the phrase was not intended to require more than a reasonable doubt. Specifically, the "actual and substantial" language was used to explain that a "reasonable doubt" was not an imaginative or speculative doubt. In addition, the trial judge further defined the requisite doubt as "a doubt the evidence generates when the jury carefully weighing all the evidence cannot say that they feel an abiding conviction of the defendants' guilt." The trial judge's use of the phrase "actual and substantial" doubt did not make it reasonably likely (alone or in conjunction with the other language highlighted by Johnson) that Johnson would be convicted under a standard of proof below that required by Due Process.[24]

Viewed as a whole, the trial court's instruction was constitutionally acceptable. Johnson's objections, viewed individually and collectively, do not prove a Cage violation entitling him to habeas relief; this claim, like his other claims, is simply not established on this record. Accordingly, we affirm the district court's denial of Johnson's § 2254 petition.

---

[24]The other language in this instruction to which Johnson objects does not give rise to a constitutional violation in these circumstances.

**AFFIRMED.**